# EXHIBIT A

Approved: _____
CHRISTOPHER L. LAVIGNE
DAVID S. LEIBOWITZ
Assistant United States Attorneys

Before:    THE HONORABLE FRANK MAAS
           United States Magistrate Judge
           Southern District of New York    11 MAG 3038

- - - - - - - - - - - - - - - -x

                                           SEALED COMPLAINT

UNITED STATES OF AMERICA          :
                                           Violations of
              - v. -              :        15 U.S.C. §§ 78j(b),
                                           78ff; 17 C.F.R. §
MICHAEL BALBOA,                   :        240.10b-5; 18 U.S.C.
                                           §§ 371, 1343, 2.
              Defendant.          :
                                           COUNTY OF OFFENSE:
- - - - - - - - - - - - - - - -x           NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

          JESSICA BROWN, being duly sworn, deposes and says that
she is a Postal Inspector with the United States Postal Inspection
Service ("USPIS") and charges as follows:

## COUNT ONE

(Conspiracy To Commit Securities Fraud and Wire Fraud)

          1.    From at least in or about January 2008 through in
or about October 2008, in the Southern District of New York and
elsewhere, MICHAEL BALBOA, the defendant, and others known and
unknown, willfully and knowingly did combine, conspire,
confederate, and agree together and with each other to commit
offenses against the United States, to wit, securities fraud, in
violation of Title 15, United States Code, Sections 78j(b) and
78ff and Title 17, Code of Federal Regulations, Section 240.10b-5;
and wire fraud, in violation of Title 18, United States Code,
Section 1343.

          2.    It was a part and object of the conspiracy that
MICHAEL BALBOA, the defendant, and others known and unknown,
willfully and knowingly, directly and indirectly, by use of the
means and instrumentalities of interstate commerce, and of the
mails, would and did use and employ manipulative and deceptive
devices and contrivances in connection with the purchase and sale
of securities, in violation of Title 17, Code of Federal

Regulations, Section 240.10b-5, by: (1) employing devices, schemes and artifices to defraud; (2) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

3.     It was further a part and object of the conspiracy that MICHAEL BALBOA, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and televison communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## Overt Acts

4.     In furtherance of the conspiracy and to effect its illegal objects, MICHAEL BALBOA, the defendant, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.     From January 2008 to October 2008, on multiple occasions, BALBOA instructed two co-conspirators not named as defendants herein ("CC-1" and "CC-2") to provide an independent valuation agent (the "IVA") with inflated month-end prices for a security that was a payment-adjusted warrant from the Government of Nigeria (the "Nigerian Warrant").

b.     From January 2008 to April 2008, CC-2, on multiple occasions, sent e-mails to the IVA with inflated month-end market prices for the Nigerian Warrant.

c.     From May 2008 through September 2008, CC-1, on multiple occasions, sent e-mails to the IVA with inflated month-end market prices for the Nigerian Warrant.

2

d.     From January 2008 to October 2008, BALBOA met with at least one investor in Manhattan, New York to discuss the Hedge Fund.

(Title 18, United States Code, Section 371.)

## COUNT TWO
(Securities Fraud)

5.     From at least in or about January 2008 through in or about October 2008, in the Southern District of New York and elsewhere, MICHAEL BALBOA, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, BALBOA made, and caused to be made, false representations to investors regarding the monthly net asset value of Millenium Global Emerging Credit Fund ("MGECF" or the "Hedge Fund"), a hedge fund for which BALBOA was the portfolio manager.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
and Title 18, United States Code, Section 2.)

## COUNT THREE
(Wire Fraud)

6.     From at least in or about January 2008 through in or about October 2008, in the Southern District of New York and elsewhere, MICHAEL BALBOA, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BALBOA instructed CC-1 and CC-2 to provide the IVA with artificially inflated month-end

3

prices for the Nigerian Warrant, in order to falsely overstate the net asset value of the Hedge Fund.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

7.    I have been a Postal Inspector with the USPIS for approximately four years.  I am currently assigned to a squad responsible for investigating violations of the federal securities laws and related offenses.  I have participated in numerous investigations of these offenses, and I have made and participated in making arrests of individuals for participating in such offenses.

8.    The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents, including documents and information provided to me by representatives of the U.S. Securities and Exchange Commission ("SEC"), documents provided by investors, and trading records.  Because this affidavit is prepared for the limited purpose of establishing probable cause, I have not set forth each and every fact I have learned in connection with this investigation.  Where conversations and events are referred to herein, they are related in substance and in part.  Where dates, figures, and calculations are set forth herein, they are approximate.

<u>RELEVANT ENTITIES, INDIVIDUALS, AND SECURITIES</u>

9.    Based upon my review of documents provided by the SEC (including documents from the IVA, CC-1's and CC-2's employers, and Millenium Global Investments Limited ("MGIL") and the Hedge Fund), and based on my conversations with representatives of the SEC, I know the following:

<u>The Hedge Fund</u>

a.    At all times relevant to this Complaint, MICHAEL BALBOA, the defendant, served as the portfolio manager for the Hedge Fund.  As of October 2007, the Hedge Fund consisted of private investment funds, which operated in a "master-feeder" structure.[1]

---

[1]    Generally speaking, "master-feeder" structures pool investment capital raised by U.S. investors and overseas investors into one central vehicle called the "master fund," and

4

b. The Hedge Fund primarily consisted of two feeder funds and one master fund. One of the feeder funds was Millennium Global Emerging Credit Fund, Ltd. (the "Offshore Feeder Fund"), which was incorporated in Bermuda. The second feeder fund was Millennium Global Emerging Credit Fund, LP (the "U.S. Feeder Fund"), a Delaware limited partnership with a general partner located in Manhattan.

c. Both the Offshore Feeder Fund and the U.S. Feeder Fund invested substantially all of their capital in the master fund – Millennium Global Emerging Credit Master Fund, Ltd. (the "Master Fund"), which was incorporated in Bermuda. Throughout this Affidavit, the Offshore Feeder Fund, the Master Fund, and the U.S. Feeder Fund are collectively referred to as the "Hedge Fund" or "MGECF."

d. The Hedge Fund's strategy was to invest in a portfolio of corporate and sovereign debt instruments in emerging countries. The Hedge Fund did not list its shares or interests on any United States securities exchange, and did not register under the United States Securities Act of 1933 or the securities laws of any state.

e. To purchase shares in the Hedge Fund, United States-based investors needed to sign a subscription document, which enabled the purchasers to buy interests in either the U.S. Feeder Fund or the Offshore Feeder Fund. The subscription document contained wire transfer instructions to a bank account in Manhattan for the minimum investment of $500,000, and provided that either of the Feeder Funds could accept or reject any prospective investor in their discretion.

f. The Hedge Fund reported net assets of approximately $844 million in August 2008 and had approximately 180 investors. Investors in the Hedge Fund included entities that were based in Manhattan. As of September 2008, the Hedge Fund held approximately $100 million worth of United States investors' money.

g. On October 16, 2008, the Master Fund and the Offshore Feeder Fund petitioned the Supreme Court of Bermuda for voluntary liquidation, and the U.S. Feeder Fund ceased operating shortly thereafter.

---

utilize separate investment vehicles or "feeders" for groups of investors. Investors actually invest in the feeder funds, which then invest in the master fund; the master fund makes investments and conducts trades.

5

MICHAEL BALBOA

h.    At all times relevant to the Complaint, BALBOA
was a Managing Director of MGIL, which was the Investment Manager
of the Hedge Fund.  MGIL is a registered investment adviser with
the SEC, and its responsibilities included day-to-day investment
decisions for the Hedge Fund.[2]

i.    As a Managing Director of MGIL, BALBOA served
as the portfolio manager for the Hedge Fund between December 2006
and October 2008.  BALBOA was based in London, and his
responsibilities included selecting the securities in which the
Hedge Fund invested.  From December 2006 to September 2008, MGIL
paid BALBOA approximately $6.5 million for his portfolio
management services to the Hedge Fund, which was based in part on
the Hedge Fund's performance.  During this period (including from
January 2008 to October 2008), BALBOA met with at least one
investor in Manhattan, New York to discuss the Hedge Fund.

The Nigerian Warrant

j.    The Hedge Fund's sovereign debt holdings
included the Nigerian Warrant.  The Nigerian Government made semi-
annual payments in mid-May and mid-November of each year for this
warrant.  The payments were based on the price of oil and were
capped at fifteen dollars per right.

k.    The Nigerian Warrant was illiquid and traded
on an over-the-counter basis, i.e. not on an exchange but through
broker-dealers, often by computer or phone.  Between January 2007
and October 2008, the actual sale and purchase prices for the
Nigerian Warrant of which I am aware, as reflected in marketplace
transactions, ranged from a low of $145.00 per Warrant to a high
of $258.00 per Warrant.

l.    The Hedge Fund purchased 23,500 of the
Nigerian Warrants between January and March 2007, for an average
price of $244 per Warrant and a total price of $5.7 million.
Other than these purchases, at no point prior to the Hedge Fund's
October 2008 petition for liquidation did the Hedge Fund sell or
purchase Nigerian Warrants.

---

[2]    While MGIL was the "investment manager" of the Hedge
Fund, Millenium Asset Management Limited ("MAML") (a private
investment services firm based in Guersney) was the "manager" of
the Hedge Fund.  MAML was an affiliate of MGIL and its listed
responsibilities included management, administration, back-office
activities, marketing, and investment activities.

## The Independent Valuation Agent

m.    The Hedge Fund utilized the IVA (an independent valuation agent) to determine the Hedge Fund's "net asset value" ("NAV"), which is the value of the Hedge Fund's assets, less liabilities and estimated costs of sale/liquidation. The IVA computed the Hedge Fund's NAV and NAV per share on a monthly basis, using market prices for the Hedge Fund's securities that were current as of the close of the last business day of the month.    MGIL and MAML then relied on the IVA's determinations in advising the Hedge Fund's investors of the Hedge Fund's month-end NAV and NAV per share.

n.    According to a March 3, 2008 offering memorandum for the Offshore Feeder Fund (the "Offering Memorandum"), for securities that were listed or quoted on a securities exchange, or similar electronic trading system, the IVA would value the security at its last known trading price.    If, among other things, no such trade had occurred and there was no active over-the-counter market, then the Offering Memorandum provided that the Directors of the Hedge Fund or the IVA would "seek to obtain a quotation from at least two independent, recognised investment banks and the average of such quotations will be taken."    The Offering Memorandum also noted that "[w]herever practicable, the [IVA] will use independent sources but may consult with the Investment Manager [MGIL] as to the most appropriate valuation."

o.    The Hedge Fund referenced the role of the IVA in a variety of documents that were sent to its investors, and to prospective investors, including the Offering Memorandum, monthly newsletters, and in responses to due diligence questionnaires ("DDQs") which were utilized by prospective investors.    For example, in one DDQ published by MGIL and current as of June 30, 2008, the Hedge Fund noted that "[t]here are no assets valued in house"; "OTC trade prices for illiquid instruments which cannot be valued at [the IVA] are marked to counterparty values and held constant across the month"; "[a]s valuation agent, [the IVA] is responsible for sourcing prices to value the fund monthly", and "[the IVA] calculates the NAV of [the Hedge Fund] independently of Millenium Global.    Additionally, in order to ensure an additional 'security layer', [MAML] performs a full reconciliation with [the IVA] on a monthly basis."

## CC-1 and CC-2

p.    As part of the valuation process, BALBOA provided the IVA with the names of brokers who could provide month-end marks for certain of the Hedge Fund's illiquid holdings. For the Nigerian Warrant, BALBOA provided the IVA with the names

7

of CC-1 and CC-2.  At all times relevant to this Complaint, CC-1
worked at an overseas office of a registered United States broker-
dealer, and CC-2 worked at an overseas office of a London-based
broker-dealer.

### OVERVIEW OF THE SCHEME TO DEFRAUD

10.  As explained more fully below, from at least in or
about January 2008 through in or about October 2008, MICHAEL
BALBOA, the defendant, instructed CC-1 and/or CC-2 to provide the
IVA with substantially inflated prices for the Nigerian Warrant.
CC-1 and CC-2 then provided these overvalued prices to the IVA.
Although I know that the Nigerian Warrant traded between $145.00
and $258.00 from January 2007 to October 2008, CC-1 and/or CC-2
provided the IVA with marks ranging from $531.25 to $3,500.00 for
this warrant.  The IVA then used these falsely inflated marks in
computing the monthly NAV for the Hedge Fund, which caused the IVA
to overstate the NAV by tens of millions of dollars, and which
resulted in higher payments to BALBOA.

### THE SCHEME: BALBOA, CC-1, and CC-2 PROVIDE FALSE PRICES FOR THE
### NIGERIAN WARRANT TO THE IVA

11.  During the course of my investigation, I have
reviewed documents provided by the SEC (including documents from
the IVA, CC-1's and CC-2's employers, and MGIL and the Hedge
Fund).  These documents include e-mail communications between
MICHAEL BALBOA, the defendant, CC-1, CC-2, and/or the IVA, as well
as recorded telephone communications between CC-1 and BALBOA.
Based on my review of this information, and based on my
conversations with representatives of the SEC, I know the
following:[3]

a.  Shortly after the Hedge Fund selected the IVA
to determine its net asset value in December 2006, MICHAEL BALBOA,

---

[3]      Throughout this Complaint, I attribute various e-mail
communications to MICHAEL BALBOA, the defendant, CC-1, and CC-2.
My attribution is based on the e-mail addresses themselves (which
contain variations of the individuals' names), the content of
certain e-mails (which indicate to whom they were addressed), as
well as on my conversations with representatives of the SEC.  In
addition, I have also attributed a series of e-mail
communications to the IVA.  Although various representatives of
the IVA sent/received the e-mail communications referenced
herein, I have attributed all of them to the "IVA."  Included in
my references to e-mail communications are instant messaging
chats.

the defendant, referred the IVA, among others, to CC-1 to get
monthly marks for certain securities.  These securities included
the Nigerian Warrant.  From January 2007 to November 2007, CC-1
provided, by e-mail, the IVA with the following month-end prices
for the Nigerian Warrant:

| Month | Price |
|---|---|
| January 2007 | $250-260 |
| March 2007 | $255-265 |
| April 2007 | $255-265 |
| May 2007 | $250-260 |
| June 2007 | $276-288 |
| July 2007 | $255-265 |
| August 2007 | $265-295 |
| September 2007 | $280-300 |
| October 2007 | $350-400 |
| November 2007 | $360-390 |

          b.    On October 2, 2007, the IVA sent an e-mail to
BALBOA, and alerted him to a disparity between prices for
securities that were quoted on "Bloomberg" and prices that were
provided to the IVA by various counterparties.[4]  Specifically, the
IVA advised:

          [a]s a standard practice, where portfolio is
          not priced at exchange close prices at month-
          end, we compare the actual price used with
          exchange close prices.  When we did the
          comparison for MGIL this month, we got huge
          variances in the bond prices. . . .  One of
          the causes could be that while we pull
          Bloomberg BGN Source prices, you may be using
          other sources.  Could you let us know the
          sources you use, so we could independently
          pull the prices from Bloomberg.  Ideally
          liquid bonds should be priced at or very
          close to the exchange prices.  Counterparty

---

     [4]     "Bloomberg" is a database which, among other things,
contains quotations from third parties for the purchase or sale
of various securities.

> prices can be used directly in case of
> illiquid bonds.

In response, BALBOA wrote by e-mail:

> [n]one of those bonds [which the IVA listed]
> trade on an exchange and most all of them do
> not price off Bloomberg. That is why we get
> counterparty prices. In some cases if you
> look on Bloomberg you will see the price data
> is extremely stale and out of date. . . . I
> am happy with the prices we have from
> counterparties. . Most of the bonds you list
> are less liquid off exchange issues.

        c.  In an October 8, 2007 e-mail to BALBOA, the
IVA pointed to "huge variances" between counterparty quotations
for certain securities held by the Hedge Fund and actual price
quotations for those same securities on Bloomberg. Accordingly,
the IVA refused to release its month-end valuation to the Hedge
Fund unless a Director of the Hedge Fund expressly approved the
IVA using these counterparty quotations as part of its month-end
valuations. BALBOA forwarded that e-mail to a Director and wrote:

> Can you please confirm to [the IVA] your
> approval to use a single counter-party
> pricing for varoius [sic] bond (which is
> inline with the rospectus [sic] for MGEC
> . . . except for year end when we require 2
> counterparties for each bond). We have been
> doing our NAV's like this since inception,
> but [the IVA] thinks we need to use exchange
> pricing rulles [sic], depsite [sic] the fact
> that none of these bonds are exchange traded,
> they are all over the counter and most are by
> appointment only. . .

In response, the Director wrote to the IVA (copying BALBOA) on
October 8, 2007, that:

> The nature of these holdings does not mean
> that there are always two prices available
> each month end as they are not exchange
> traded. Historically I believe [the IVA]
> have done their utmost to obtain two prices
> for each but have not always managed to. Of
> course it is essential to do so at year end
> in preparation for the financial statements
> of account. Unless you have a material
> concern for the prices you have managed to

obtain then please release the NAV
accordingly.

d. Two days later, the Director clarified to the
IVA by e-mail (again copying BALBOA) that "[w]e have not yet
reviewed the full valuation and therefore I am not approving it.
However, we are approving you to release it to us for review with
certain bonds only having one pricing source, under the guidance
of the PPM [private placement memorandum]."

e. Within months of this e-mail exchange, BALBOA
began utilizing CC-2 as the second "counter-party" to provide
month-end marks to the IVA for various securities, including the
Nigerian Warrant. In a January 2, 2008 e-mail to the IVA, BALBOA
identified CC-2 as an individual who could be contacted for
pricing relating to the Nigerian Warrant.

### The December 2007 Valuation

f. On January 3, 2008, CC-1 e-mailed the IVA a
month-end quote for December 2007 of "370-470" for the Nigerian
Warrant. On January 7, 2008, the IVA sent an e-mail to CC-2,
asking for a December 2007 month-end price for, among others, the
Nigerian Warrant. The same day, CC-2 forwarded that e-mail to
BALBOA, writing "this is what they have asked me to price".
BALBOA responded: "i will call you later. . do not send anything
to them yet As [sic] i think this might change," to which CC-2
replied: "Okay. I will hold off on doing anything (including
getting prices) until then". Later that same day, on January 3,
2008, CC-2 sent an e-mail to the IVA, which stated that the
"val'n price[]" for the Nigerian Warrant was "370 - 470".

g. On January 11, 2008, the IVA sent an e-mail to
CC-2 asking for "the revised tender offer price on the [Nigerian]
warrant." A few minutes later, BALBOA sent an e-mail to CC-2
writing "[CC-2] - if [the IVA] asks for tender price on those
[Nigerian Warrants] it is 525 . . . . ." Less than a minute
later, CC-2 sent an e-mail to BALBOA stating "[j]ust left you a
voice mail about it.. okay will do". Within minutes, CC-2
provided the price of "525" by e-mail to the IVA. The IVA valued
the Nigerian Warrant for the month ending December 2007 at $525.

### The January 2008 Valuation

h. On January 31, 2008, CC-1 e-mailed the IVA
with a month-end quote of "500-525" for the Nigerian Warrant. On
February 4, 2008, CC-2 e-mailed the IVA with a month-end price of
"5.15 - 5.30" for the Nigerian Warrant, which CC-2 later clarified
was "515 - 530." For the month ending January 2008, the IVA
valued the Nigerian Warrant at $517.50, which is the average of

11

the median of the two ranges CC-1 and CC-2 provided to the IVA, i.e. 512.5 and 522.5.

## The February 2008 Valuation

i.     On March 3, 2008, CC-1 e-mailed the IVA a month-end quote of "500-525" for the Nigerian Warrant.  In a March 4, 2008 e-mail, the IVA asked CC-2 for the "Month End prices" of the Nigerian Warrant.  CC-2 forwarded that e-mail request to BALBOA, stating "Michael they are looking for this price as well." BALBOA responded "515 x 525."  The same day, CC-2 provided the IVA with a month-end price of "515-525" for the Nigerian Warrant.  For the month ending February 2008, the IVA valued the Nigerian Warrant at $516.25, which is the average of the median of the two price ranges CC-1 and CC-2 provided to the IVA, i.e. 512.5 and 520.

## The March 2008 Valuation

j.     On April 1, 2008, CC-1 wrote an e-mail to BALBOA, asking "when i can call for mtm" (referring to mark-to-market).[5]  The same day, CC-1 sent an e-mail to the IVA, providing "500-525" as the month-end mark for the Nigerian Warrant.  In an April 10, 2008 email, the IVA e-mailed CC-2 asking for the "03/31 Prices of the [Nigerian Warrant]," to which CC-2 responded: "[s]orry for the delay 5.25 - 5.75."  Later the same day, CC-2 confirmed by e-mail that the actual price was 525-575.

k.     The IVA marked the Nigerian Warrant for March 2008 at 531.25, which is the average of the median of the ranges CC-1 and CC-2 provided to the IVA, i.e. 512.5 and 550.

## The April 2008 Valuation

l.     In a May 1, 2008 instant message session between BALBOA and CC-1, CC-1 wrote: "Mike, god [sic] time foe [sic] mark-to-mkt before my dinner at Saveurs des lles?"  BALBOA responded: "can we do it tomorrow?," to which CC-1 agreed.  On May 5, 2008, CC-1 wrote an e-mail to BALBOA: "Let me know when best to call you (cannot reach you)," to which BALBOA responded: "[o]n a train, call in 10 mins."

---

[5]     "Mark-to-market" is a shorthand reference to valuing an asset or liability based on its current (as opposed to long-term) value, which value can be based on a known, current market price.

12

    m. I have listened to a May 5, 2008 phone call
between BALBOA and CC-1.[6]  During this call, BALBOA and CC-1
discussed the appropriate marks to assign to the Nigerian Warrant
for April 2008:

    CC-1:  We had the Nigeria 500 to 525

    BALBOA: Yes, and I need to make those a bit higher
        [CC-1's first name]

    CC-1:  Yes?

    BALBOA: More like something like 1300 to 1500.

    CC-1:  1300 to 1500?

    BALBOA: Yes.

    CC-1:  Wow.  I guess it's really low? [laughs].

    BALBOA: It's a little low, it's a little low. . . .

    CC-1:  Wow.  That's a good one.

The same day, CC-1 provided the IVA with a month end price of
"1300-1500" for the Nigerian Warrant.

    n. On May 8, 2008, the IVA also requested from
CC-2 an April 2008 month-end price for the Nigerian Warrant.  The
same day, CC-2 referenced the IVA's request to a co-worker and
asked what the month end prices were for the Nigerian Warrant.
CC-2 later wrote to BALBOA by e-mail: "let me know when you can
talk.  Send me a counterparty price for Nigeria .. that works."
In response, BALBOA sent by e-mail to CC-2 a copy of CC-1's May 5,
2008 e-mail (referenced above) to the IVA, which CC-2 forwarded on
to his co-worker, asking if he could "go ahead and price the same
as this broker."  Later that same day, CC-2 sent an e-mail to the
IVA stating: "Sorry but I have not seen these trades so no
valuation."  On May 12, 2008, the IVA advised BALBOA by email that
"[CC-2] says they do not have the Valuation for the Nigerian
Warrant."

    o. On May 14, 2008, the IVA sent an e-mail to CC-
1 stating "Hello [CC-1], We would like to confirm the [Nigerian

---

  [6] The summaries of the recorded calls that are set forth
in this affidavit are based on preliminary draft
transcripts/translations prepared from the recordings, which I
have reviewed and which are subject to revision.

Warrant] prices again since its differing way too much from the last time." Less than an hour later, CC-1 forwarded this e-mail to BALBOA and wrote: "Mike, [IVA] asking for a justification of the Nigeria wrt move from 500 to 1300-1500. . i have no idea. ." BALBOA responded: "[j]ust say that Oil was up and these are tied to oil prices," to which CC-1 replied "perfect." The same day, CC-1 sent a response e-mail to the IVA: "confirmed. . this asset tied to oil prices up tremendously !!!"

          p.    On May 14, 2008 the IVA sent an e-mail to BALBOA asking him to "confirm that for the [Nigerian Warrant] Prices from 1 Counterparty is sufficient," to which BALBOA responded "[y]es it's ok."

          q.    The IVA valued the Nigerian Warrant at $1400 for the April 2008 period, which was the average of the range (1300-1500) that CC-1 provided to the IVA by e-mail.

### The May 2008 Valuation

          r.    On June 3, 2008, CC-1 wrote an e-mail to BALBOA, asking "when i can call:)" I have listened to a June 3, 2008 phone call between BALBOA and CC-1. During this call, BALBOA and CC-1 discussed the appropriate marks to assign to the Nigerian Warrant, as follows:

> CC-1:    And then the Nigerian warrant erm. . . well in really high [laughs] 1300 to 1500.
>
> BALBOA:    Yes, just leave those there.
>
> CC-1:    1300 to 1500, and i think that's it. That's it. I will send you the copy.

          s.    The same day, CC-1 sent an e-mail to the IVA, advising it that month-end prices for the Nigerian Warrant were "1300-1500." CC-1 later forwarded a copy of this e-mail to BALBOA. The IVA marked the Nigerian Warrant at $1400 – the mid-point of the mark – for the month ending May 2008.

### The June 2008 Valuation

          t.    On July 1, 2008, CC-1 sent an e-mail to BALBOA, and wrote "Hola Mike, let me know when u r free for MTM" [referring to mark-to-market]. Later that same day, CC-1 wrote to BALBOA "MTM ? :))," to which BALBOA responded "[w]ill call you in an hour?," to which CC-1 replied "OK." I have listened to a July 1, 2008 phone call between BALBOA and CC-1. During this call,

14

BALBOA and CC-1 discussed the appropriate month-end marks to assign to the Nigerian Warrant, as summarized below:

> CC-1:     So in case they ask for Nigeria.
>
> BALBOA:   Just keep it where it was.
>
> CC-1:     1300 to 1500.
>
> BALBOA:   Yes that's fine.
>
> CC-1:     Okay, it's a tough market, it's very I mean the equity doesn't help. It's very difficult.

u. On July 8, 2008, the IVA sent an e-mail to CC-1, asking that he "please provide us the Price for the [Nigerian Warrant] for COB 06/30/08." CC-1 responded by e-mail: "1300-1500." On July 14, 2008, BALBOA wrote an e-mail to CC-1 asking "[i]f [the IVA] contact you for any updates on month end can you let me know?" CC-1 responded by e-mail: "of course, will do :)."

v. Two days later, on July 16, 2008, the IVA sent CC-1 an e-mail asking CC-1 to "please confirm the Price for the [Nigerian Warrant] again because i think it's same as last month's price. I am asking it again to avoid the miscalculations." CC-1 then forwarded the e-mail to BALBOA and wrote: "mike . can i confirm 1300-1500 ?" BALBOA replied by e-mail the same day: "[p]lease revise up to 2240-2440 If they ask just say higher oil prices," to which CC-1 responded "ok." Later that same day, CC-1 sent an e-mail to the IVA: "In fact , with oil prices around usd 145 then, those [referring to the Nigerian Warrant] were 2240-2440 Hope that helps (difficult to price)." On July 28, 2008, the IVA sent an e-mail containing its valuations for all of the Hedge Fund's assets, including the Nigerian Warrant, to BALBOA. The mark that the IVA provided for the Nigerian Warrant for June 2008 was $2340, i.e. the mid-point of the range that CC-1 provided.

## The July 2008 Valuation

w. On August 4, 2008, the IVA sent an e-mail to BALBOA, stating that it had "[e]mailed to [CC-1] on Friday but still no response." On August 5, 2008, the IVA sent an e-mail to BALBOA, asking him to "provide any contacts [for CC-1's employer] as [CC-1] is on vacation and we don't have any other contacts for them." On August 6, 2008, CC-1 sent an e-mail to BALBOA stating "Mike, mark-to-market for Nigeria wrts?" Less than two hours later, BALBOA responded by e-mail: "[d]o it very wide 2650 x 3680." CC-1 responded by e-mail: "ok." The same day, August 6, 2008, CC-1 sent an e-mail to the IVA indicating that the mark for the Nigerian Warrant was "2650-3680."

15

x.    On August 12, 2008, BALBOA sent an e-mail to the IVA, asking it to "please ask" about the Nigerian Warrant. The following day, August 13, 2008, the IVA sent an e-mail to a co-worker of CC-1 ("CC-1's Co-Worker"), asking CC-1's Co-Worker to "confirm the below two marks provided by CC-1" (one of which included the Nigerian Warrant).  CC-1's Co-Worker responded: "I guess both are fine.  [CC-1] gave them to you a few days ago, right?  Let me check again.  Thanks."  The IVA responded by e-mail: "[CC-1] have given both a few days ago but just want to confirm as it seems a bit different from what was expected."

y.    The same day, CC-1's Co-Worker wrote an e-mail to BALBOA asking: "these marks [including the Nigerian Warrant] are fine?  It seems they are different from expected. . ."  BALBOA responded: "[p]lease ask [CC-1] to phone me on those."  Later the same day, CC-1's Co-Worker wrote an e-mail to BALBOA stating "Mike, please let me know re mtm for Ngeria [sic] and [another security].  Being asked for it."  BALBOA responded "[s]peaking to [CC-1] now."  Subsequently the same day, CC-1 sent an email to the IVA listing the marks for the Nigerian Warrant as "3150-3680." For the month ending July 2008, the IVA valued the Nigerian Warrant at $3415, the middle of the above range (3150 and 3680).

## The August 2008 Valuation

z.    On September 1, 2008, CC-1 wrote an e-mail to BALBOA, stating "let me know when u r free for the mark-to-mkt :)"  BALBOA responded: "[c]an we do it tomorrow?"  CC-1 responded "no worries, i ll invent a story for [the IVA](NY closed...)."

aa.   On September 1, 2008, a broker-dealer located in England (the "Broker-Dealer") sent an e-mail to BALBOA with a subject line referring to "Nigeria Oil Warrants," stating: "Michael we are $214-219 on the screen, traded around 40K at around $215, 45k left any cares? Subj a call."  Based on my review of trading records, I know that BALBOA never purchased the Nigerian Warrants from the Broker-Dealer, even though the Warrants were being offered at $214-219 and, based on BALBOA's instructions to CC-1, the IVA was valuing them at $3415 per warrant.[7]

bb.   I have listened to a September 2, 2008 phone call between BALBOA and CC-1.  During this call – which was one day after BALBOA received a quote of "$215" from the Broker-Dealer

---

[7]    I also have reviewed documents from the Broker-Dealer's United States affiliate, which show that the affiliate traded the Nigerian Warrant on September 3, 2008, purchasing 23,250 Nigerian Warrants from the Broker-Dealer for $209.50 per warrant, and selling the same amount for $214.00 per warrant.

for the Nigerian Warrant – BALBOA advised CC-1 to provide the IVA
with a quote of $2750-$3200 for the Nigerian Warrant.
Specifically, CC-1 and BALBOA stated the following:

CC-1:       And last one is a Warrant of Nigeria on which
            we had them 925-975.

BALBOA:     No, no, those are the [another security] that
            you have there.  925-975, the Nigeria you
            have like, I don't remember, like [U/I] or
            something?

CC-1:       No, but that's where we are, that's where we
            made a mistake I think, let me, yes, that
            where we made a mistake.  Hold on. . . .
            Nigeria 2650-3680.  So that's what we gave
            2650 to 3680 and that where there was a
            problem.

BALBOA:     Why did they re-issue again or something like
            that?  Is that with the one they said oh
            sorry, can you re-confirm or something?

CC-1:       Let me think.  Yes, please confirm the price
            for the below once again and there was one
            which was one [another security] in French
            franc and the other one was Nigeria so let me
            see one on search of that.  It says [U/I].
            Yes, I confirm actually 3150-3880 [translated
            from French] you might be right.  I just
            need to make sure I'm not doing anything
            stupid.  So I did confirm, actually I did
            confirm, 3150, 3150 to 3680.

BALBOA:     Yes, so why don't you give them something
            slightly lower like 2750 by, like, 3200,
            something like that?  Like four, five hundred
            difference?

CC-1:       Okay.  Hold on one second. . . .  I'm just
            making one for Nigeria.

BALBOA:     Yes, do like 2750 by, like, 3150, something
            like that.

CC-1:       Okay. [U/I] Okay so it was really my mistake,
            when did I send it, I'm trying to find my
            message where I sent my mistake but I can't
            find it.

17

BALBOA:      It's alright, I think you're good there
             [CC-1's first name].

*****

CC-1:        So, let me do again, Nigeria so I put 2750.

BALBOA:      Yes.

CC-1:        2750-3200, no?

BALBOA:      Yes.

*****

CC-1:        Okay.  Okay, so, if there is any problem, any
             doubt I will ask you anyway but let me send
             that to her and then I sent you a copy.

cc.    That same day, September 2, 2008, CC-1 wrote
an e-mail to IVA listing the August 2008 month-end mark for the
Nigerian Warrant as "2750-3200."  Subsequently, also the same day,
CC-1 forwarded that same e-mail to BALBOA.

dd.    On September 12, 2008, BALBOA sent an e-mail
to the IVA with a subject line of "pricing list" and an attachment
that listed prices for various securities the Hedge Fund held.
Among these securities was the Nigerian Warrant, which, based on
CC-1's marks of $2750 and $3200, the IVA had valued at $2975.
Regarding the Nigerian Warrant, BALBOA asked: "please query [CC-
1's Employer.]"  Four days later, on September 16, 2008, BALBOA
sent a follow-up e-mail to the IVA, asking: "[d]id you get updated
levels for the rest of these from Friday???  The [name of
security] and the [Nigerian Warrant]?"  The same day, the IVA sent
an e-mail to CC-1, and copied to BALBOA, which read: "Hi [CC-1],
Could you please provide the updated price for COB 29th Aug 08
[Nigerian Warrant]."

ee.    Later that same day, September 16, 2008, CC-1
forwarded the IVA's e-mail to BALBOA, stating: "Mike, i last sent
2750-3200   what should i send now?"  BALBOA responded two minutes
later by e-mail: "Tell them it was 3275 x 3875 thanks".  Later
that same day, CC-1 wrote by e-mail to the IVA: "I believe it was
3275-3875 as of Aug 29th 08."  The same day, the IVA forwarded
this e-mail to BALBOA, and wrote "[p]lease see Nigeria Warrant
price as below."

18

ff.   The IVA assigned an August 2008 month end mark of $3575.00 to the Nigerian Warrant - the mid-point of the range that CC-1 provided.

### The September 2008 Valuation

gg.   On September 26, 2008, the IVA advised BALBOA (by e-mail) of the following:

> In order to streamline the month-end pricing
> process, the task of obtaining
> bonds/equities/warrants month-end prices for
> MGEC fund is been [sic] taken over by our []
> Team. [] already collects prices for other
> funds and hence have a set of contacts at
> various counterparties, which will help in
> obtaining prices for MGEC too.

hh.   On October 1, 2008, CC-1 sent an e-mail to BALBOA, stating "[c]are to do mtm now?]." About ten minutes later, CC-1 wrote: "Mike, care to do mark-t0-mkt [sic] now? (i ll be out tomorrow and Friday. . . . would rather do today." BALBOA responded the same day by e-mail "[l]et me know when you get the list", to which CC-1 responded "i have it..they sent 2 days in advance!!! (but for COB 30th)".

ii.   I have listened to an October 1, 2008 phone call between BALBOA and CC-1. During this call, BALBOA and CC-1 discussed the appropriate month-end marks to assign to the Nigerian Warrant, as summarized below:

> CC-1:     And then the last one is. . .  the sensitive
>           one, this is a Nigeria Warrant, we have them
>           2,750 to 3,200.
>
> BALBOA:   Uhhh. . .  just make it really wide [CC-1's
>           first name].  Like 3,000 to 4,000 something
>           like that.
>
> CC-1:     3,000-4,000, okay.
>
> BALBOA:   Okay.
>
> CC-1:     Uhhh. . .   I will uh, i will send you the
>           copy.
>
> BALBOA:   Perfect, thank you, sir.
>
> CC-1:     Okay.

jj. The same day, CC-1 sent an e-mail to the IVA, marking the Nigerian Warrant at "3000-4000" for the month of September 2008. CC-1 thereafter forwarded that e-mail onto BALBOA.

kk. On October 10, 2008, the IVA sent an e-mail to CC-1 stating: "Could you please reconfirm the September month-end mark for [the Nigerian Warrant] . As per our sources, the month-end price should be between the range of 150-200." On October 13, 2008, an MGIL employee (the "MGIL Employee") sent an e-mail to CC-1, stating "[h]i [CC-1] [w]e purchased some Nigeria Warrants back in January from you for which we receive monthly revals for. [The IVA] advise that the latest reval price [CC-1's employer] issued was 2,300? Please could you check this as it seems incorrect since we bought these warrants at 239." The same day (October 13, 2008), CC-1 forwarded the e-mail on to BALBOA, writing "Mike, that s [sic] the one we have at 3000-4000 .. can you talk to [the first name of the MGIL Employee]?"

ll. On October 16, 2008, BALBOA sent an e-mail to CC-1, inquiring: "[d]id you recently reconfirm certain prices with [the IVA]?"

mm. On October 16, 2008, the IVA sent an e-mail to BALBOA, referencing the Nigerian Warrant:

> For [the Nigerian Warrant] we have recd a quote of 3500 mid from [CC-1's employer], 190 mid and 185 mid from [two broker-dealers] respectively. Since [CC-1 employer's] quote is vastly different from the other two quotes, we plan to use the average of [the two broker-dealers'] mid quotes.

nn. On October 16, 2008, the Offshore Feeder Fund and the Master Fund petitioned the Bermuda Supreme Court for liquidation.

### BALBOA'S SCHEME SUBSTANTIALLY OVERSTATED
### THE NET ASSET VALUE OF THE HEDGE FUND

12. Based on my review of documents provided by the SEC, and based on my conversations with SEC officials, I have determined that MICHAEL BALBOA, the defendant, deliberately inflated the month-end marks for the Nigerian Warrant and caused the IVA to overstate the net asset value of the Hedge Fund.

a. As summarized above, although the highest known trading price for the Nigerian Warrant from January 2007 to

20

September 2008 was $258, the IVA assigned month-end marks to the Nigerian Warrant ranging from $517.50 (for January 2008) to $3,575.00 (for September 2008). During this same period, the Hedge Fund did not purchase or sell any Nigerian Warrants. Because the Hedge Fund held 23,500 Nigerian Warrants, MICHAEL BALBOA, the defendant, falsely inflated the total valuation for the Nigerian Warrants in January 2008 from approximately $12,161,250 to $84,012,500. Moreover, as of July 2008, the Nigerian Warrant was one of the two largest positions of the Hedge Fund. The total valuation for the Nigerian Warrant exceeded that of the Hedge Fund's third largest holding by more than $50 million.

                b.    BALBOA's scheme to inflate the marks for the Nigerian Warrant resulted in the Hedge Fund over-stating its net asset value. For example, had the IVA valued the Nigerian Warrant at $258 per month,[8] then the reported NAV of the Hedge Fund was overstated by about one percent for January 2008 (reported $463.8 million vs. actual $457.7 million) and by approximately ten percent for July 2008 (reported $794.8 million vs. actual $714.2 million) and by approximately ten percent for August 2008 (reported $844.3 million vs. actual $760.3 million). These false overstatements were communicated to investors through, among other things, monthly newsletters that outlined the NAV and NAV per share of the Hedge Fund.

---

[8]     $258 represents the highest known trading price for the Nigerian Warrant during the period January 2007 to October 2008. When referring to the "actual" NAV of the Hedge Fund, I have assumed that the IVA's valuations of the Hedge Fund's other assets were accurate, notwithstanding additional evidence to the contrary of which I am aware. When referring to the "reported" NAV of the Hedge Fund, I have relied on the "fund size" of the Offshore Feeder Fund and the U.S. Feeder Fund, as reported in monthly newsletters that were disseminated to investors.

WHEREFORE, the deponent prays that an arrest warrant be issued for MICHAEL BALBOA, the defendant, and that he be imprisoned or bailed as the case may be.

JESSICA BROWN
POSTAL INSPECTOR
UNITED STATES POSTAL INSPECTION SERVICE

Sworn to before me this
30ᵗʰ day of November, 2011

THE HONORABLE FRANK MAAS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

22