UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

SECURITIES AND EXCHANGE
COMMISSION,

              *Plaintiff*,

-against-

MICHAEL R. BALBOA and GILLES T. DE
CHARSONVILLE,

              *Defendants*.

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-6-15

11 Civ. 8731 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Securities and Exchange Commission ("SEC") moves for partial summary judgment in this civil enforcement action against Defendant Gilles De Charsonville. The SEC seeks an order granting a permanent injunction against future violations of the Exchange Act and the Advisers Act,[1] an award of disgorgement with prejudgment interest, and the imposition of third tier penalties against De Charsonville. For the following reasons, the motion is granted.

## BACKGROUND[2]

From 2003 through December 2011, De Charsonville worked for BCP Securities, LLC ("BCP"), a broker-dealer with headquarters in Greenwich, Connecticut. 56.1 Statement ¶ 2. From 2007-2008, he worked out of BCP's Madrid office brokering sales and purchases of

---

[1] De Charsonville does not oppose the SEC's request for a permanent injunction. Def. Mem. at 1 n.1.

[2] The facts stated here are based on the SEC's Local Rule 56.1 Statement, which De Charsonville does not dispute. Def. Mem. at 1 n.2.

1

emerging market bonds on behalf of clients. *Id.* He earned commissions on these sales and provided his clients with a complementary mark-to-market service, through which he would provide valuations of securities in the client's portfolio. *Id.* During this period, De Charsonville was registered with FINRA as a Foreign Associate. *Id.*

From December 2006 until October 2008, Michael Balboa was a managing director of Millennium Global Investments, an investment manager in London, England. *Id.* ¶ 1. Balboa managed the portfolios for several Millennium Global funds (collectively, the "Funds"). *Id.* The Funds operated from December 2006 until October 2008, when they were liquidated. *Id.* Investors were told Balboa had no role in valuing assets and simply managed the Funds' investments. *Id.*

GlobeOp Financial Services, LLC ("GlobeOp"), a financial services firm that provides independent valuation services to financial services entities, acted as the Funds' independent valuation agent, pursuant to a Valuation Services Agreement operative from December 2006 until October 2008. *Id.* ¶ 3. In this capacity, GlobeOp provided independent valuations of the Funds' holdings and calculated the Funds' net asset value each month. *Id.* In order to perform these services for illiquid securities, GlobeOp would solicit the opinions of brokers or counter-parties trading such securities regarding the value of the securities. *Id.* Under the Valuation Services Agreement, if Balboa and a counter-party disagreed regarding valuation, the counter-party's valuation would control. *Id.* De Charsonville served as a counter-party source for valuing some of the Funds' holdings. *Id.* GlobeOp expected that the valuations provided by De Charsonville were accurate and were not influenced by Balboa. *Id.*

2

On March 19, 2013, Balboa was charged in a superseding indictment with securities fraud and wire fraud, conspiracy to commit the same, and investment adviser fraud. *Id.* ¶ 5. On December 18, 2013, a jury found Balboa guilty of all five charged offenses. *Id.* ¶ 6.[3] De Charsonville testified at both trials after obtaining a non-prosecution agreement pursuant to which he will not be charged criminally for any conduct described in his testimony in exchange for his full cooperation, including with the SEC. *Id.* ¶ 8.

De Charsonville testified at trial: In 2006, Balboa suggested De Charsonville to GlobeOp as a broker who could provide valuations for the Funds. *Id.* ¶ 11. Each month, De Charsonville would receive a list of 15 to 20 securities from GlobeOp, of which he was to provide valuations at the end of the month. *Id.* For a typical valuation, De Charsonville would obtain information by consulting Bloomberg, but De Charsonville did not follow this procedure for two securities. *Id.* ¶ 12. For the Nigerian warrants and the Uruguayan warrants held by the Funds,[4] De Charsonville simply used valuations supplied by Balboa. *Id.* ¶ 13.

De Charsonville agreed to this approach with Balboa in March or April 2007. *Id.* ¶ 14. He also agreed not to inform GlobeOp that the valuation came from Balboa. *Id.* In January 2008, De Charsonville began to suspect that Balboa's valuations were not accurate. *Id.* ¶ 17. In May 2008, GlobeOp contacted De Charsonville to question the valuation he had provided. *Id.* ¶ 18. De Charsonville sought out the true valuation for that security from a third party, and learned that Balboa's valuations were "grossly inflated." *Id.* ¶¶ 18-19. He then asked Balboa to fabricate a justification for him to pass on to GlobeOp to support the valuation. *Id.* ¶ 19. De

---

[3] A previous trial ended in a mistrial. *Id.* ¶ 6 n.3.

[4] De Charsonville began providing Balboa-supplied valuations on the Uruguayan warrants beginning in April 2008. *Id.* ¶ 13. He provided these valuations monthly for months end May 2008 through September 2008. *Id.* ¶ 16.

3

Charsonville continued to participate in Balboa's scheme even after he realized its full extent. *Id.* ¶ 20. One month when Balboa could not provide valuations, De Charsonville reassured him that he would simply "invent a story for GlobeOp." *Id.*

De Charsonville testified that he continued to participate in the fraud because he did not want to lose Balboa as a client. *Id.* ¶ 32. De Charsonville received compensation on a commission basis earned from trades placed through him. *Id.* ¶ 33. For 2007-2008, the total commissions De Charsonville earned through Balboa's trading amounted to $543,046. *Id.*

In April 2008, an auditor from Deloitte & Touche, who was conducting an independent audit of Millennium Global, sought to confirm the valuations De Charsonville had provided. *Id.* ¶ 22. In response, De Charsonville provided Deloitte with the valuations he had received from Balboa and provided to GlobeOp. *Id.* ¶ 23.

When the Funds collapsed, Balboa warned De Charsonville that the Funds' liquidators may ask him about the valuations he provided. *Id.* ¶ 25. Balboa offered to provide De Charsonville with two documents he created with information about the warrants to conceal De Charsonville's lack of knowledge about the warrants. *Id.* Balboa also showed De Charsonville "damning" email correspondence between the two, which was in the possession of the Funds' liquidator. *Id.* When contacted, De Charsonville lied to the Funds' CEO, concealing the fact that the valuations had come from Balboa and inventing explanations for the valuations. *Id.* ¶ 26.

De Charsonville subsequently lied and concealed the scheme in conversations with Spanish securities regulators when they contacted him in February 2011. *Id.* ¶¶ 27-29. Similarly, after the SEC sued De Charsonville and Balboa and after the Department of Justice charged Balboa criminally, De Charsonville lied, and then began to tell "half-truth[s] in a quest

4

for leniency," asking his lawyer to tell prosecutors that De Charsonville understood GlobeOp to be a part of Millennium Global and not an independent entity. *Id.* ¶ 30. De Charsonville provided the full truth a year later, in January 2013, after prosecutors refused to give him a deferred prosecution agreement. *Id.* ¶¶ 30-31. De Charsonville continues to work as a broker selling emerging market securities. *Id.* ¶ 34.[5]

As previously indicated, *see supra* note 2, De Charsonville does not dispute the facts provided in the SEC's 56.1 Statement. *See* Def. Counterstatement at 1. De Charsonville, however, submitted a counterstatement with "additional material facts," including that he has two sons, and while he still works in the securities industry, he earns significantly less than he did previously—in 2013, he made €81,000 and in 2014 he made €59,000, compared with the $1,180,000 he earned in 2010. *Id.* ¶¶ 1-2. He also submitted that he provided the Government with numerous documents that would not otherwise have been available to the Government, and that his cooperation was critical to the successful prosecution of Balboa. *Id.* ¶¶ 5, 7. These statements are supposed to address the SEC's request for disgorgement and the imposition of civil penalties which De Charsonville claims are excessive.

## DISCUSSION

### I. Applicable Law

A party moving for summary judgment "is entitled to judgment as a matter of law" when there is "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). In determining whether a genuine dispute exists, the court "construe[s] the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Pandora Media, Inc. v. Am. Soc'y of Composers, Authors & Publishers*,

---

[5] The SEC has incorrectly numbered this paragraph number 33.

785 F.3d 73, 77 (2d Cir. 2015) (internal citations and quotation marks omitted). Where the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party," summary judgment must be entered in the moving party's favor because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party prevails when "'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 192 (2d Cir. 2014) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II. Analysis

De Charsonville concedes liability and does not oppose a permanent injunction against future violations[6] or an award of prejudgment interest. Def. Mem. at 1 n.1, Reply at 1. De Charsonville opposes disgorgement and argues that the civil penalties sought are excessive. Def. Mem. at 4-12. Accordingly, the Court considers only the appropriateness of the disgorgement award and the civil penalties sought by the SEC.

### A. Disgorgement

The SEC seeks disgorgement in the amount of $297,174, the amount De Charsonville received in commissions from trades he executed for Balboa in 2008, but not 2007. *See* Garcia Decl. ¶ 5. De Charsonville argues that disgorgement should be denied because the SEC "has failed to establish the requisite causal nexus between the commissions and the wrongful conduct at issue in this action, *i.e.* that De Charsonville would not have received these commissions *but*

---

[6] The SEC has assured De Charsonville that the injunction sought does not include an industry suspension or bar in this proceeding. Reply at 2 n.3.

6

*for* his role in Balboa's fraud." Def. Mem. at 4. De Charsonville disputes the propriety of determining disgorgement based on trades with Balboa because De Charsonville and Balboa's relationship was not dependent upon the provision of the inflated valuations and because Balboa was De Charsonville's client before the two engaged in the fraudulent scheme. *Id.* at 5.

This argument misunderstands the burden-shifting nature of disgorgement. It is true that the Government "must distinguish between the legally and illegally derived profits" when seeking disgorgement, *S.E.C. v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) (internal citation and quotation marks omitted), and that the disgorgement award cannot exceed the amount acquired through wrongdoing because it is a remedial, rather than punitive, remedy, *S.E.C. v. Cavanagh*, 445 F.3d 105, 116 n.25, 117 (2d Cir. 2006) (internal citations omitted). But disgorgement need only be a "reasonable approximation of profits causally connected to the violation," *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996) (internal citation and quotation marks omitted), and once the SEC has met its burden of reasonable approximation, the party opposing disgorgement must demonstrate that his gains were "unaffected by his offenses," *Razmilovic*, 738 F.3d at 31-32 (internal citations and quotation marks omitted). "Any risk of uncertainty in calculating disgorgement should fall upon the wrongdoer whose illegal conduct created that uncertainty." *S.E.C. v. Contorinis*, 743 F.3d 296, 304-305 (2d Cir. 2014) (internal alterations and quotation marks omitted) (citing *First Jersey*, 101 F.3d at 1475).

Here, De Charsonville's illegal conduct directly created any uncertainty. His participation in the scheme with Balboa, animated by a desire to maintain Balboa as a client, led to profits in an amount difficult to discern. De Charsonville has failed to rebut the SEC's demonstration of a causal connection between the fraud and the commissions, and has simply asserted the speculative notion that Balboa may have directed the same number of trades through

7

De Charsonville in the absence of the scheme. That speculation, however, does not establish that a disgorgement award is improper here. Besides, De Charsonville himself established the requisite causal connection when he testified that Balboa was "one of the top five clients" with whom he sought to maintain a solid relationship, and that he was "an active client, a good client, and I wanted to keep him that way." Tr. 493:15-17, 513:9-10. In light of De Charsonville's testimony that he engaged in the scheme to maintain his relationship with Balboa and so that Balboa would continue to place trades through him, there is a sufficient causal connection between the fraud and the commissions.

The SEC has demonstrated that the amount of the award is reasonable. The SEC did not seek De Charsonville's whole compensation, nor did it seek to include commissions from Balboa's trades prior to the year 2008, reflecting the fact that De Charsonville's relationship with Balboa predated the scheme. The amount requested by the SEC, which represents approximately 12.4 percent of De Charsonville's total compensation for 2008, demonstrates the SEC's best efforts to isolate the profits De Charsonville earned through the fraud, and De Charsonville must bear the risk of any uncertainty. Accordingly, De Charsonville is ordered to pay $297,174 in disgorgement.

De Charsonville does not oppose the imposition of prejudgment interest. The SEC has calculated prejudgment interest at $67,261.46, using the IRS underpayment rate and the dates January 1, 2009, through November 30, 2014. Brown Decl., Ex. K. Prejudgment interest prevents the wrongdoer from "obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity." *S.E.C. v. Alt. Green Techs., Inc.*, 2014 WL 7146032, at *3 (S.D.N.Y. Dec. 15, 2014) (internal citations and quotation marks omitted). The Court finds the imposition of prejudgment interest appropriate, and the SEC's calculations thereof correct.

*See, e.g., S.E.C. v. Credit Bancorp, Ltd.*, 2011 WL 666158, at *3 (S.D.N.Y. Feb. 14, 2011).

### B.  Civil Penalties

Under the Exchange Act, the Court may impose civil monetary penalties for violations of the securities laws. 15 U.S.C. §§ 77t(d), 78u(d)(3). The purpose of civil penalties is to "deter future violations, . . . encourag[e] investor confidence, increase[e] the efficiency of financial markets, and promot[e] the stability of the securities industry." *S.E.C. v. Metcalf*, 2012 WL 5519358, at *7 (S.D.N.Y. Nov. 13, 2012) (internal citations and quotation marks omitted). In determining civil penalties, which are discretionary, the Court considers (1) the egregiousness of the conduct at issue; (2) the degree of scienter; (3) the losses or risk of losses created by the conduct; (4) the isolated nature or frequency of the conduct, if repeated; and (5) defendant's demonstrated current and future financial condition and present ability to pay. *See S.E.C. v. Wyly*, 56 F. Supp. 3d 394, 407 (S.D.N.Y. 2014). The Court may also take into account the defendant's cooperation and acceptance of responsibility, *Alt. Green Techs., Inc.*, 2014 WL 7146032, at *4, as well as other remedies already imposed to determine whether a penalty is "unduly harsh under the circumstances," *Wyly*, 56 F. Supp. 3d at 433-34. Third tier penalties, the most severe, are applicable where "fraud, deceit, manipulation, or deliberate and reckless disregard of a regulatory requirement" formed a part of the violation and the violation caused, or created a significant risk of, substantial losses to others, and authorize fines in the amount of up to $130,000[7] for each violation. 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).

The SEC seeks to impose third tier penalties for De Charsonville's violations. Pl. Mem. at 22-25. In calculating the total amount of penalties, the SEC seeks to have each of De Charsonville's transmissions of Balboa-supplied valuations to GlobeOp treated as a separate

---

[7] This amount takes into account the required adjustment for inflation. *See* Pl. Mem. at 22 n.11.

9

violation, to reach a total award of $2,600,000. *Id.* at 23. De Charsonville opposes both the imposition of third tier penalties and the method of calculating the number of violations.

"The civil penalty assessed is a fact-specific determination and the facts here do not merit the maximum penalty." *S.E.C. v. 800america.com, Inc.*, 2006 WL 3422670, at *12 (S.D.N.Y. Nov. 28, 2006). The Court agrees with the SEC that third tier penalties are appropriate here, but does not agree that each valuation transmission should be considered a separate violation. *See, e.g., S.E.C. v. Elliot*, 2012 WL 2161647, at *11 (S.D.N.Y. June 12, 2012) (declining to impose higher tier penalties because "given the number of transactions and the amounts that could be assessed per transaction, such an award would be unduly penalizing."). In determining the disgorgement award, the Court considered the scheme in its entirety with respect to the causal connection between the fraud and the alleged profits, finding that even if Balboa may have executed some number of trades through De Charsonville absent the fraud, it was reasonable to attribute all commissions earned from Balboa's trades during 2008 as unlawful profits from the fraud. The Court will continue to view the fraud in its entirety. In addition, this is De Charsonville's first violation; even though he stumbled initially, he ended by cooperating extensively with the SEC and the Department of Justice;[8] the fraud was limited in time; and he is already paying a significant disgorgement award. Accordingly, the Court will consider transmission of fraudulent valuations for the Nigerian warrants as one violation and transmission of fraudulent valuations for the Uruguayan warrants as a separate violation, and will apply the maximum third tier penalty to each of these violations, resulting in a penalty of $260,000. *See,*

---

[8] The SEC urges the Court to consider that De Charsonville already received the benefit of his agreement to cooperate because he now faces no criminal sanction, unlike the defendants in the cases relied upon by De Charsonville to support his argument that the requested penalties are too high. Reply at 6-8. That the Department of Justice agreed not to charge De Charsonville criminally cannot be held against De Charsonville financially.

*e.g., Alt. Green Techs.*, 2014 WL 7146032, at *6 (finding that "imposing only one maximum civil penalty will serve as a sufficient deterrent, both specifically and generally, to future securities violations"). The Court believes such a penalty is sufficient to deter future such conduct and to penalize De Charsonville for his violations, without imposing undue hardship.

## CONCLUSION

For the foregoing reasons, the SEC's motion for partial summary judgment is granted. De Charsonville is permanently enjoined from violating: Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; Sections 206(1), (2), and (4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), (2) and (4), and Rule 206-4(8) thereunder, 17 C.F.R. § 275.206(4)-8(a)(2); and FINRA Rule 5210. De Charsonville is ordered to pay disgorgement in the amount of $297,174 plus prejudgment interest in the amount of $67,261.46, and he is ordered to pay third tier civil penalties for two violations, in the amount of $260,000.

Dated: New York, New York
      July 6, 2015

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge